MARY CLARKIN and Another v. BIWABIK–BESSEMER COMPANY and Others.[1]

July 15, 1896.

Nos. 9991—(235).

**Licensee of Dangerous Premises—Liability of Owner—Reasonable Opportunity to Remove—Negligence.**

Certain contractors erected a boarding camp upon mining property, where they were engaged in mining, under contract with the owners of the property; and, by permission of the contractors, plaintiffs occupied the camp, and boarded the contractors' workmen. Subsequently the contractors abandoned the contract and premises, and plaintiffs intended and attempted to remove from the camp, with their property used therein, but were delayed by reason of the severity of the weather, dangerous sickness of a member of their family, and financial inability in obtaining another place. The defendant company resumed possession of the mining property, and stored a large amount of dynamite in a building thereon, situate within 33 feet of the boarding camp; and, about three weeks thereafter, this dynamite, while being heated by defendants, exploded, damaging plaintiffs' personal property situate in the boarding camp. Prior to the explosion, defendants notified plaintiffs that, if they remained in the boarding camp, they would do so at their own risk, but gave them no notice to remove from the camp, and took no legal steps to compel them to do so. The defendants stored the dynamite in the building about three weeks before the explosion, and while the camp was still occupied by the plaintiffs. *Held*:

(1) That, under the facts appearing in this case, the plaintiffs remained in possession of the boarding camp as bare licensees, and that the question of whether they had reasonable opportunity to remove from the boarding camp with their property before the time of the explosion was a question for the jury.

(2) While the plaintiffs were in the actual possession of the boarding camp as bare licensees, the defendants would be liable for damages to plaintiffs' property therein situate resulting from the explosion of the dynamite, if the explosion was caused by defendants' want of ordinary care and skill in its management, although in their lawful possession at the time.

Action in the district court for St. Louis county to recover damages for the destruction of personal property. The case was tried before Moer, J., who directed a verdict in favor of defendants. From an

[1] Reported in 67 N. W. 1020.

order denying a motion for a new trial, plaintiffs appealed.    Reversed.

*Jno. Jenswold, Jr.*, for appellants.
*Billson, Congdon & Dickinson*, for respondents.

BUCK, J.[2]   The Biwabik-Bessemer Company (defendant) was incorporated June 16, 1894, and soon thereafter leased certain mining property from the Biwabik Ore Company.    The other defendants, Jones and Kimberly, were, respectively, the superintendent and timekeeper of the Bessemer Company; Jones having charge of its affairs at its mine, where the events hereinafter referred to occurred.   Prior to the leasing of the said mine by the defendant company, a firm by the name of Fitzgerald Bros. & Sisk had been stripping the mine and mining ore for the ore company.    In and about this business, this firm employed a large number of men, and to accommodate them the firm built what was known as "Fitzgerald's Camp," a building about 60 feet long by 28 feet wide, situate some 600 or 700 feet from the mine. The plaintiffs, who are sisters, had for many years been keeping boarding camps for Fitzgerald Bros., who were railroad contractors; and in December, 1893, they entered into a contract with the Fitzgeralds to board their laborers for a period of three years, the Fitzgeralds to furnish the camp boarding house, and to pay them for the board which plaintiffs furnished.    During the ensuing winter they were not to pay any rent, and the amount of subsequent rent was never agreed upon, and it does not appear that any was ever paid.    Plaintiffs commenced boarding Fitzgerald's men, who were stripping the mine, and so continued to board them until the work ceased for the winter.    When work was renewed in the spring, they continued to board Fitzgerald's men, to the number of about 30, until work closed about November 30, 1894.    In the month of October, a misunderstanding arose between Fitzgerald and the company; and he left the work in care of his foreman, stating to plaintiffs that he expected the difficulty would be adjusted, and that he would return and finish his contract, and that plaintiffs would have all the boarders they could keep during the winter; and they knew nothing to the contrary until January 10, 1895, when the defendant Kimberly told them that the defendant company had bought the camp, and, if they wanted the contract to board the

---

[2] Mitchell, J., absent, took no part.

men, to see the defendant Jones. The Fitzgeralds gave up the contract December 5, 1894, and abandoned the work.

About February 1, 1895, the defendant company, with a crew of men, commenced stripping the mine at a point within about 700 feet of the camp occupied by the plaintiffs. About 33 feet from this camp was a small office building, which had been built by the Fitzgeralds, standing about one foot above the ground, upon blocks; was 16 feet by 20 feet in size, with a window and door; and was built of rough boards standing on ends, the outside of which was covered with tar paper, the inside being bare, and, by reason of the manner of its general construction, required considerable heat to warm it. It was about 200 yeards from the nearest house, and within a quarter of a mile there was a cluster of houses occupied by some 15 families, in the outskirts of the town of Biwabik. The Fitzgeralds left the key to this office with the plaintiffs, who, in January, 1895, turned it over to the defendant Kimberly. From the first part of February, until February 24, 1895, the defendants stored dynamite in this office building, which was necessary for the mining operations carried on by the defendant corporation at its mine. When frozen this dynamite would not explode, and, before it could be used for mining operations, it had to be warmed to soften it. For this purpose the defendants placed it near the stove, according to the temperature of the room, usually 80 degrees above zero. Fire was usually kept in this building through the days, but not at nights. During the month of January, 1895, the weather was very cold, the thermometer averaging about 20 degrees below zero, and at times it was 40 degrees below. The room where the dynamite was stored was heated by a box stove, about four feet long, 30 inches wide, and 14 inches high, and at times the heat was intense; as one of the witnesses expressed it, "red hot part of the time." On February 24, 1895, about 600 pounds of dynamite was stored in this office building, and a portion of it was being warmed by the fire in the stove, when an explosion occurred, destroying the office building and the boarding camp, and also a large amount of the personal property of the plaintiffs.

From February 4, 1895, until a few moments before this explosion, there lived with these plaintiffs, in this boarding camp, a niece of the plaintiffs, about 12 years old, and their father, 76 years old, who was dangerously sick and confined to his bed, until Feb-

ruary 22, when he was just able to walk, but still weak. About February 15, the defendant Jones sent word to the plaintiffs that, if they remained in the boarding camp any longer, it must be at their own risk. Reasons were testified to by one of the plaintiffs as to why they did not move away from the camp. One was the dangerous illness of their aged father, and the other, that they were financially unable, although they made an effort to do so, and expected to move about March 1, 1895. The weather was also intensely cold. It is quite evident that the fire occurred from the great heat of the stove, or by its setting fire to inflammable material near it, and causing the dynamite to explode. Upon the alarm of fire being given, plaintiffs succeeded in getting their father and niece into a cave, about 16 feet from the camp, before the dynamite exploded.

After the testimony was closed, the court, upon motion, instructed the jury to return a verdict for the defendants, which was done accordingly.

Upon this statement of the facts arises the question of the liability of the defendants for the destruction of plaintiffs' property by the explosion.

We do not consider the question of landlord and tenant, discussed by the respective counsel, as at all material in the case. The premises were under the control of the defendant company and its employés. While the Fitzgeralds and Sisk were the contractors carrying on the mining operations for the Biwabik Ore Company, they had the rightful possession, under the contract, of the premises upon which the boarding camp was erected, as incident to their business, and they contracted with plaintiffs to board their mining laborers in this boarding camp, and the Fitzgeralds and Sisk were to pay plaintiffs for so doing. This gave the plaintiffs a license to occupy the boarding camp as long, at least, as the Fitzgeralds and Sisk continued their business under the contract, and permitted plaintiffs to occupy such camp. When Fitzgerald Bros. & Sisk abandoned the contract, the defendants never gave the plaintiffs any notice to remove from the premises, but only notified them that it was dangerous for them to remain in the boarding camp. Their right to remain there was not openly denied or asserted by the defendants. As they were there in the first instance by permission of Fitzgerald Bros. &

Sisk, we are of the opinion that the evidence shows that they remained there as bare licensees.

In such case they would have a reasonable time to remove therefrom. Ingalls v. St. Paul, M. & M. R. Co., 39 Minn. 479, 40 N. W. 524. What was such reasonable time, under the facts of this case, was a question for the jury. For several weeks prior to the explosion, the plaintiffs' father was seriously sick. This was the middle of winter, in a cold climate, with the thermometer sometimes down to 40 degrees below zero, and the average cold very severe, and the opportunity for procuring another place to live limited, not only on account of the locality, but on account of the extreme poverty of the plaintiffs. While financial inability to procure another place, and the expense of removal, would not of itself justify the plaintiffs in not removing from the place if they were there by absolute wrong, and had notice to remove, yet all the facts stated, together with the fact that these plaintiffs are women, without male assistants, it seems to us, make the case peculiarly one which should have been left to the jury to consider and determine as to whether they had a reasonable opportunity to remove from the camp.

When the plaintiffs originally took possession and commenced to occupy this boarding camp, this dangerous agency was not in their immediate vicinity. It was only about three weeks before the explosion that the defendants first stored this dynamite in this office building, situate so near to the plaintiffs' boarding camp. Previously it had been stored in a building a quarter of a mile away. The rule which is sometimes applied, that trespassers assume all risks from the condition of the premises upon which they enter is not applicable to this case. The defendants knew full well the dangerous character of this dynamite, and in the use of such dangerous agency the law requires, if not the greatest care, when human lives or property interests are in jeopardy, at least ordinary care in its use. It was not the case of mere passive acquiescence in a trespasser or a bare licensee coming upon the premises where there was a defect, and thereby receiving an injury, but a damage resulting from the affirmative active negligence of the defendants in handling an inflammable and powerful instrumentality which they knew required a great degree of care in handling.

"Duties grow out of circumstances, the authorities tell us, and that which in one case would be an ordinary and proper use of one's rights may, by a change of circumstances, become negligence and a want of due care."

Kay v. Pennsylvania R. Co., 65 Pa. St. 269.

It seems to us that the duty of the defendants in this case rested upon the plainest principles of justice and humanity. The injurious consequences which resulted from this explosion might have been foreseen and expected by the defendants in placing this dynamite near to a stove kept red hot, and in a wooden building, without any person left to guard it. They could not relieve themselves of the responsibility of their affirmative acts by simply notifying the plaintiffs that, if they remained in camp, they did so at their own risk. The notice itself shows how fully the defendants understood and comprehended the great danger to which the plaintiffs were subject by the manner in which the dynamite was being handled and managed. If we assume that the plaintiffs had no reasonable opportunity to move their household and property before the time of the explosion, and that they remained in the actual possession of the boarding camp as bare licensees, with their personal property situate therein, the defendants would be liable for damaging this property by the explosion of the dynamite, if such explosion was caused by want of ordinary care and skill in its management by defendants, although they were then in the lawful possession of the premises where the dynamite was stored. Ordinarily, questions of negligence are for the jury; and, upon the testimony introduced in this case, different minds might draw different conclusions, and therefore this question of negligence should have been submitted to the jury. It was therefore error for the court to take these questions from the jury, and direct a return of a verdict for the defendants.

Order reversed.